UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

JOEL NDUNDA,

      Plaintiff,

v.

BRANDI PFEIL, individually and in her
official capacity as Mobile Crisis
employee for Charleston/Dorchester
Mental Health; CAITLIN MCGARTY,
individually and in her official capacity
as Mobile Crisis employee for
Charleston/Dorchester Mental Health;
CECILE GUERRIERO, individually and
in her official capacity as Mobile Crisis
Supervisor for Charleston/Dorchester
Mental Health; Dennis Pueblas,
Individually and in his official capacity
as the Site Manager CHARLESTON/
DORCHESTER MENTAL HEALTH
CENTER, a South Carolina governmental
entity; SOUTH CAROLINA
DEPARTMENT OF BEHAVIORAL AND
DEVELOPMENTAL DISABILITIES,
a South Carolina governmental entity;
JOHN DOE PROBATE JUDGE, identity
presently unknown, individually and in
official capacity; CHARLESTON
COUNTY, SOUTH CAROLINA;
JOHN DOE MUSC EVALUATOR #1;
JOHN DOE MUSC EVALUATOR #2;
JOHN DOE MUSC CHARGE NURSE;
MEDICAL UNIVERSITY OF SOUTH
CAROLINA; TIA LEWIS, individually
and in official capacity; JOHN DOE
DEFENDANTS 1-5,

      Defendants.

_____/

Civil Action No. 2:25-cv-13185-BHH-MHC

RCVD - USDC - CHAS, SC
2025 OCT 29 AM 11:58

1

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | JOEL NDUNDA |
| Street Address | 4015 LAURELWOOD DR |
| City and County | CHARLESTON |
| State and Zip Code | SC 29414 |
| Telephone Number | |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known).  Attach additional pages if needed.

SEE ATTACHED

Defendant No. 1

| | |
|---|---|
| Name | |
| Job or Title (if known) | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title (if known) | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

Defendant No. 3

| | |
|---|---|
| Name | |

Defendants.

_____/

SUMMONS IN A CIVIL ACTION

To:

BRANDI PFEIL
c/o Charleston/Dorchester Mental Health Center
2100 Charlie Hall Boulevard
Charleston, SC 29414

CAITLIN MCGARTY
c/o Charleston/Dorchester Mental Health Center
2100 Charlie Hall Boulevard
Charleston, SC 29414

CECILE GUERRIERO
c/o Charleston/Dorchester Mental Health Center
2100 Charlie Hall Boulevard
Charleston, SC 29414

DENNIS PUEBLAS
c/o Charleston/Dorchester Mental Health Center
2100 Charlie Hall Boulevard
Charleston, SC 29414

CHARLESTON/DORCHESTER MENTAL HEALTH CENTER
Registered Agent for Service of Process
[OR]
Executive Director
2100 Charlie Hall Boulevard
Charleston, SC 29414

SOUTH CAROLINA DEPARTMENT OF BEHAVIORAL AND DEVELOPMENTAL
DISABILITIES
Registered Agent for Service of Process
[OR]
Director, South Carolina Department of Mental Health
2414 Bull Street
Columbia, SC 29201

AND

Office of the Attorney General
State of South Carolina
Rembert C. Dennis Building
1000 Assembly Street
Columbia, SC 29201

JOHN DOE PROBATE JUDGE (Once Identity Known)
NAME OF PROBATE JUDGE - To Be Determined
Charleston County Probate Court
84 Broad Street
Charleston, SC 2401

CHARLESTON COUNTY, SOUTH CAROLINA
Charleston County Attorney
Lonnie Hamilton III Public Services Building
4045 Bridge View Drive
North Charleston, SC 29405

JOHN DOE MUSC EVALUATOR #1 (Once Identity Known)
[NAME - To Be Determined Through Discovery]
c/o Medical University of South Carolina
171 Ashley Avenue
Charleston, SC 29425

JOHN DOE MUSC EVALUATOR #2 (Once Identity Known)
[NAME - To Be Determined Through Discovery]
c/o Medical University of South Carolina
171 Ashley Avenue
 Charleston, SC 29425

JOHN DOE MUSC CHARGE NURSE (Once Identity Known)
[NAME - To Be Determined Through Discovery]
c/o Medical University of South Carolina
171 Ashley Avenue
Charleston, SC 29425

MEDICAL UNIVERSITY OF SOUTH CAROLINA
Registered Agent for Service of Process
[OR]
President, Medical University of South Carolina
171 Ashley Avenue
Charleston, SC 29425

## V.     Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.     For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: October 29, 2025.

Signature of Plaintiff

Printed Name of Plaintiff     JOEL NOUNDA

### B.     For Attorneys

Date of signing: _____, 20___.

Signature of Attorney     _____

Printed Name of Attorney     _____

Bar Number     _____

Name of Law Firm     _____

Address     _____

Telephone Number     _____

E-mail Address     _____

|                         |   |
|-------------------------|---|
| Job or Title (if known) |   |
| Street Address          |   |
| City and County         |   |
| State and Zip Code      |   |
| Telephone Number        |   |

Defendant No. 4

|                         |   |
|-------------------------|---|
| Name                    |   |
| Job or Title (if known) |   |
| Street Address          |   |
| City and County         |   |
| State and Zip Code      |   |
| Telephone Number        |   |

## II.     Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☐ Federal question          ☑ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.     If the Basis for Jurisdiction Is a Federal Question     SEE ATTACHED

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

JURISDICTION AND VENUE SECTION

3

COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS
UNDER 42 U.S.C. § 1983 AND RELATED FEDERAL CLAIMS
DEMAND FOR JURY TRIAL

========================================
INTRODUCTION
========================================

1. This is a civil rights action arising from governmental retaliation against a citizen who exposed professional inadequacy and threatened litigation against governmental officials. Plaintiff seeks damages and injunctive relief for systematic violations of his constitutional rights under the First, Fourth, and Fourteenth Amendments through unlawful psychiatric detention orchestrated by multiple state actors.

2. On May 1, 2025, after Plaintiff demonstrated technical knowledge about cyber attacks that Defendants admitted they lacked, exposed Defendants' professional inadequacy, and stated his intent to "sue the people involved in the cyber attacks," Defendants immediately coordinated through a 15-minute phone call with their supervisor and then fabricated evidence to justify his psychiatric detention in retaliation.

3. Defendants' own documentary evidence, including their Crisis Intervention Sheet documenting "Safety Concerns: NONE," Service Log showing "Emergency: N," and MUSC hospital records with diagnosis field left BLANK and unsigned—proves no medical basis existed for detention. When psychiatric experts at Patrick B. Harris Psychiatric Hospital (PLBH) properly refused to authorize hospitalization for lack of medical clearance, Defendants intensified their coordination efforts involving multiple governmental entities to achieve the predetermined outcome of punishing Plaintiff for threatening litigation.

4. This case involves the weaponization of the mental health system against a citizen who challenged governmental authority, accomplished through systematic fabrication of evidence, multi-entity conspiracy, fraudulent procurement of a probate court order, and ongoing obstruction of justice through cyber attacks and a defamation campaign that has prevented Plaintiff from obtaining legal representation.

========================================
JURISDICTION AND VENUE
========================================

5. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343(a)(3) and (4) (civil rights jurisdiction), and 42 U.S.C. § 1983 (civil rights violations under color of state law).

6. This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

2

3.     The Amount in Controversy

The amount in controversy—the amount the plaintiff claims the defendant owes or the amount at stake—is more than $75,000, not counting interest and costs of court, because *(explain)*:

_____

_____

_____

## III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

SEE ATTACHED ( PAGE 3)
_____

_____

_____

_____

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

_____

_____

_____

_____

_____

7. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in Charleston County, South Carolina, which is within this judicial district, and Defendants reside in this district.

==========================================
PARTIES
==========================================

PLAINTIFF

8. Plaintiff JOEL NDUNDA is a citizen of the United States and a resident of Charleston County, South Carolina. At all times relevant to this Complaint, Plaintiff was a private citizen entitled to the full protections of the United States Constitution.

9. Plaintiff appears pro se in this action because Defendants' ongoing defamation campaign and cyber attacks have prevented Plaintiff from obtaining legal representation, itself constituting continuing civil rights violations and obstruction of justice.

DEFENDANTS

10. Defendant BRANDI PFEIL was at all relevant times a Mobile Crisis employee employed by Charleston/Dorchester Mental Health Center, acting under color of state law. She is sued in her individual capacity for damages and in her official capacity for injunctive relief.

11. Defendant CAITLIN MCGARTY was at all relevant times a Mobile Crisis employee employed by Charleston/Dorchester Mental Health Center, acting under color of state law. She is sued in her individual capacity for damages and in her official capacity for injunctive relief.

12. Defendant CECILE GUERRIERO was at all relevant times the Mobile Crisis Supervisor for Charleston/Dorchester Mental Health Center. Defendant Guerriero received the 15-minute coordination call from Mobile Crisis Employees immediately after Plaintiff threatened litigation and participated in conspiracy to detain Plaintiff in retaliation. Guerriero is sued in individual and official capacities.

13. Defendant CHARLESTON/DORCHESTER MENTAL HEALTH CENTER is a governmental entity established under South Carolina law, operating mental health crisis services in Charleston and Dorchester Counties. It employs Mobile Crisis employees who conduct mental health assessments and coordinate involuntary commitments. It is sued for institutional liability under Monell v. Department of Social Services, 436 U.S. 658 (1978).

14. Defendant SOUTH CAROLINA DEPARTMENT OF MENTAL HEALTH is a state governmental entity responsible for oversight, policy-setting, training, and supervision of mental health crisis services throughout South Carolina. It is sued for institutional liability under Monell.

3

15. Defendant JOHN DOE PROBATE JUDGE, identity presently unknown, was at all relevant times a Probate Judge for Charleston County, South Carolina, acting under color of state law. This judge coordinated ex parte with Mobile Crisis employees before legal requirements for involuntary commitment were met and issued an order without required physician certification in violation of South Carolina Code §§ 44-17-410, 44-22-100. Probate Judge is sued in individual capacity for damages (qualified immunity does not protect deliberate constitutional violations) and in official capacity for injunctive relief. Plaintiff will amend to substitute real party upon discovering identity through discovery.

16. Defendant CHARLESTON COUNTY, SOUTH CAROLINA is a governmental entity responsible for the actions of its probate court and probate judges. Charleston County is sued for institutional liability under Monell. NOTE: Charleston County is a political subdivision of the state, NOT the State of South Carolina itself. Counties are not protected by Eleventh Amendment sovereign immunity and may be sued under Monell for policies, customs, and practices of their courts and officials.

17. Defendant JOHN DOE MUSC EVALUATOR #1, identity presently unknown, was employed by MUSC and evaluated Plaintiff at approximately 2:00 AM on May 2, 2025. This evaluator told Plaintiff: "You need someone with more experience than me," admitting inadequacy, yet failed to obtain evaluation by a qualified professional as required by South Carolina law. MUSC Evaluator #1 is sued in individual and official capacities. Identity will be provided upon discovery.

18. Defendant JOHN DOE MUSC EVALUATOR #2, identity presently unknown, was employed by MUSC as Registered Nurse and evaluated Plaintiff at approximately 10:00 AM on May 2, 2025. Registered Nurses cannot make psychiatric diagnoses under South Carolina law. This RN left diagnosis field BLANK and evaluation UNSIGNED, yet authorized continued detention for approximately 20 hours. MUSC Evaluator #2 is sued in individual and official capacities. Identity will be provided upon discovery.

19. Defendant JOHN DOE MUSC CHARGE NURSE, identity presently unknown, was employed by MUSC and received a "rapport" call from Mobile Crisis employees facilitating Plaintiff's admission after Patrick B. Harris Psychiatric Hospital properly refused admission. This charge nurse participated in a conspiracy by accepting a patient whom a psychiatric hospital had refused for lack of medical clearance. MUSC Charge Nurse is sued in individual and official capacities. Identity will be provided upon discovery.

20. Defendant MEDICAL UNIVERSITY OF SOUTH CAROLINA (MUSC) is a state governmental entity operating a hospital and psychiatric evaluation services. MUSC evaluators left diagnosis BLANK and unsigned, yet detained Plaintiff for approximately 20 hours without qualified professional certification. MUSC is sued for institutional liability under Monell.

21. Defendant TIA LEWIS was at all relevant times employed by South Carolina Department of Mental Health as Patient Advocate, responsible for investigating complaints and protecting patient rights. Instead, Defendant Lewis fabricated justifications for other Defendants' conduct,

admitted lying about non-existent "protocol," and perpetuated false "involuntary commitment" narrative despite reviewing records proving diagnosis BLANK and unsigned. Lewis is sued in individual and official capacities.

22. Defendants JOHN DOE 1-5 are individuals whose identities are presently unknown but who participated in the conspiracy to violate Plaintiff's rights, including probate court personnel who coordinated ex parte with Mobile Crisis employees and other conspirators to be identified through discovery. Plaintiff will amend this Complaint to name these defendants upon discovering their identities.

========================================
FACTUAL ALLEGATIONS
========================================


=============================================================
DEFENDANTS' MOTION CHARACTERIZATION vs. DOCUMENTED REALITY
=============================================================

DEFENDANTS' STRATEGIC FRAMING IN MOTION TO DISMISS

23. In their Motion to Dismiss at page 2, Defendants characterize this case as follows:

"Plaintiff in this matter was transported and/or committed to MUSC ER by an Order of Detention by the Charleston County Probate Court following a mental health evaluation by employees of the BHDD Office of Mental Health's Mobile Crisis Unit. Plaintiff's claims in this matter concern this commitment and his subsequent treatment at MUSC." ( SEE EXHIBIT L)

24. This characterization employs strategic language designed to make unlawful detention appear as legitimate medical intervention. Each element of Defendants' framing obscures critical facts and their own documented admissions.

DEFENDANTS' CHARACTERIZATION #1: "Following a mental health evaluation"

25. This suggests a complete, proper evaluation occurred BEFORE the probate court order. Defendants' own records prove otherwise:

26. Timeline of Coordination Before Legal Requirements Met:
    a. Defendants admitted in their state court Motion to Dismiss that they coordinated with probate court "before assessment was complete" (Defendants' own admission)
    b. Patrick B. Harris Psychiatric Hospital refused admission stating "could not admit the pt w/o medical clearance" - proving no physician certification existed as required by S.C. Code § 44-17-410 (See Exhibit B)

   c. Final MUSC evaluation: Diagnosis field BLANK, signature line UNSIGNED - proving no qualified professional ever certified need for commitment (See Exhibit C)
   d. Order obtained through ex parte coordination BEFORE statutory requirements met

27. Reality: This was not "following evaluation" - this was coordination to obtain judicial order to override psychiatric hospital's professional refusal, accomplished before legal requirements were satisfied.

DEFENDANTS' CHARACTERIZATION #2: "Transported and/or committed"

28. The vague "and/or" language obscures a critical fact proven by hospital records: NO INVOLUNTARY COMMITMENT EVER OCCURRED.

29. Documentary Proof No Commitment Occurred:
   a. Hospital evaluation form: Diagnosis field BLANK (See Exhibit C)
   b. Signature line: UNSIGNED by any qualified professional (See Exhibit C)
   c. Plaintiff released without any diagnosis
   d. Even MUSC RN evaluation at 10:00 AM left unsigned (See Exhibit C)

30. False Statement to Court: At the October 9, 2025 state court hearing, Defendants' counsel stated to the Court that Plaintiff was "involuntarily committed." This statement is demonstrably false based on hospital records.

31a. Pattern Extended to Written Pleadings: In their written Memorandum in Support filed October 7, 2025, Defendants perpetuated the false 'involuntary commitment' narrative, stating: 'In addition, it is likely that every person involuntarily committed does not believe and/or disagrees with findings in their evaluation.' (See Exhibit K, pg. 11). This statement in written pleading to Court:
   a. Perpetuates false claim that Plaintiff was 'involuntarily committed'
   b. Attempts to preemptively dismiss documented fabrication as expected 'disagreement'
   c. Made with knowledge that hospital records contradict commitment claim
   d. Constitutes written fraud on court, not merely oral misrepresentation
   e. Shows pattern: false narrative across motion (Exhibit L) + memorandum (Exhibit K) + oral argument

31b. Pattern of False "Involuntary Commitment" Narrative:
   a. State court hearing (October 9, 2025): Counsel's oral representation
   b. Patient Advocate Records: "Citizen was involuntarily admitted to MUSC" (See Exhibit D)
   c. This false narrative has been systematically perpetuated despite contradictory records

32. Reality: This was unlawful detention accomplished without qualified professional certification, not a legitimate involuntary commitment "following evaluation."

**DEFENDANTS' CHARACTERIZATION #3: "Order of Detention by Charleston County Probate Court"**

33. This frames the probate court order as a legitimate legal process. Defendants' own admissions and documentary evidence prove the order was procured through judicial corruption:

34. Evidence of Judicial Coordination and Statutory Violations:
   a. Order issued WITHOUT required physician certification (S.C. Code § 44-17-410 violation)
   b. Ex parte coordination between probate court and crisis workers before statutory requirements met (Defendants admitted "before assessment complete")
   c. Patrick B. Harris Psychiatric Hospital had already refused admission for lack of medical clearance (See Exhibit B)
   d. Order obtained to OVERRIDE psychiatric hospital's professional medical judgment
   e. No meaningful judicial review occurred - rubber-stamp coordination with executive branch

35. The Coordination Timeline Proves Predetermined Outcome:
   a. Crisis workers decided hospitalization necessary (evidenced by seeking "direct admission" to PLBH)
   b. PLBH refused: "could not admit without medical clearance" (See Exhibit B)
   c. Crisis workers contacted probate court (admitted in motion to dismiss)
   d. 15-minute coordination call to administrator GUERRIERO
   e. Probate judge issued order without required physician certification
   f. Crisis workers transported to MUSC as backup facility
   g. "Gave rapport to charge nurse" to facilitate admission (See Exhibit B - Service Log admission)
   h. MUSC admitted when psychiatric hospital had refused
   i. Diagnosis left BLANK and unsigned (See Exhibit C)

36. Reality: This was not a legitimate "Order of Detention" - this was coordination between executive branch (crisis workers) and judicial branch (probate judge) to circumvent legal safeguards after psychiatric experts refused to authorize hospitalization.

**DEFENDANTS' CHARACTERIZATION #4: "Plaintiff's claims concern this commitment and his subsequent treatment at MUSC"**

37. This fundamentally mischaracterizes Plaintiff's claims. This case is NOT about "treatment" following a legitimate commitment. This case is about:

38. First Amendment Retaliation:
   a. Detention immediately after threatening litigation ("I want to sue")
   b. 15-minute coordination call to supervisor after litigation threat
   c. Timeline proves but-for causation: threat to sue → coordination → hospitalization
   d. Fabricated evidence to manufacture basis for retaliation

7

39. Fourth Amendment Violation - Seizure Based on Fabricated Evidence:
   a. Defendants changed "sue" to "hurt" to manufacture violent threat from legal statement (See Exhibits E, F - family affidavits)
   b. Defendants' own contemporaneous findings: "Safety Concerns: NONE" (See Exhibit A)
   c. Defendants' own contemporaneous findings: "Emergency: N" and "NO EMERGENCY" (See Exhibit B)
   d. Maximum distance parking proves consciousness that danger claim was false
   e. 15+ minutes unsupervised proves no genuine emergency

40. Multi-Entity Conspiracy:
   a. PLBH refused admission for lack of medical basis (See Exhibit B)
   b. Probate court coordinated before legal requirements met (Defendants' admission)
   c. "Gave rapport to charge nurse" at MUSC to facilitate improper admission (See Exhibit B)
   d. All safeguards systematically circumvented through coordination
   e. Predetermined outcome achieved despite absence of medical or legal basis

41. The Unlawful Detention Itself:
   a. This case concerns the UNLAWFUL NATURE of the detention
   b. Not "subsequent treatment" after legitimate commitment
   c. The detention was accomplished through:
      - Fabricated evidence (10+ documented fabrications)
      - Retaliation for protected speech (threatening litigation)
      - Multi-entity conspiracy (crisis workers + probate court + MUSC)
      - Circumvention of all legal safeguards
      - Judicial corruption (order without required certification)

CRITICAL EVIDENCE DEFENDANTS' CHARACTERIZATION OMITS

42. Defendants' Motion Fails to Acknowledge Their Own Documented Findings:
   a. "Safety Concerns: NONE" (Crisis Intervention Sheet - Exhibit A)
   b. "Emergency: N" (Service Log - Exhibit B)
   c. "NO EMERGENCY" notation (Service Log - Exhibit B)
   d. PLBH refusal: "could not admit without medical clearance" (Service Log - Exhibit B)
   e. Diagnosis: BLANK (Hospital evaluation - Exhibit C)
   f. Signature: UNSIGNED (Hospital evaluation - Exhibit C)

43. Evidence of Retaliation Defendants' Characterization Omits:
   a. Plaintiff's statement: "I want to sue" (documented, witnessed by family - Exhibits E, F)
   b. Defendants changed "sue" to "hurt" to manufacture threat (Exhibits E, F)
   c. 15-minute coordination call to supervisor immediately after litigation threat
   d. Timeline: litigation threat → coordination call → hospitalization announced
   e. Temporal proximity proves but-for causation

44. Evidence of Conspiracy Defendants' Characterization Omits:
   a. "Gave rapport to charge nurse" - admission of pre-existing coordination (Exhibit B)
   b. Probate court contacted "before assessment complete" (Defendants' admission)
   c. All safeguards failed in same direction toward detention
   d. Multi-entity coordination: crisis workers + probate court + MUSC + law enforcement

45. Physical Evidence Proving Consciousness of Fabrication:
   a. Maximum distance parking (proves knew danger claim false)
   b. 15+ minutes unsupervised (proves knew emergency claim false)
   c. Time given to change clothes and pack (proves no genuine urgency)
   d. Patient Advocate confirmed parking "through neighbor's yard" (Exhibit D)

CONCLUSION: DEFENDANTS' CHARACTERIZATION IS STRATEGIC MISREPRESENTATION

46. Defendants characterize this as routine mental health transport "following evaluation" resulting in legitimate "commitment." Their own records tell a different story:

47. What Actually Occurred:
   a. Plaintiff threatened litigation ("I want to sue")
   b. Defendants immediately coordinated with supervisor (15-minute call)
   c. Defendants fabricated evidence (changed "sue" to "hurt")
   d. Psychiatric hospital refused admission (no medical basis)
   e. Defendants coordinated with probate court before legal requirements met
   f. Order obtained without required physician certification
   g. Defendants forum-shopped to MUSC using "rapport" with charge nurse
   h. Admission processed without qualified diagnosis (BLANK and unsigned)
   i. Released with no diagnosis, proving no medical basis ever existed

48. This was not "treatment following evaluation." This was systematic conspiracy to achieve predetermined detention in retaliation for threatening litigation, accomplished by:
   - Fabricating evidence to manufacture danger
   - Overriding psychiatric hospital's professional refusal
   - Corrupting judicial process through ex parte coordination
   - Circumventing all legal safeguards requiring qualified certification
   - Using pre-existing relationships to facilitate improper admission

49. The evidence, most of it from Defendants' own concealed records, proves this case involves the weaponization of the mental health system against a citizen who challenged governmental authority, not legitimate psychiatric care "following evaluation."

BACKGROUND: CYBER ATTACKS AND TARGETING

50. Beginning in 2023 and continuing through the present, Plaintiff has been the victim of sophisticated cyber attacks, content injection, electronic harassment, and targeting.

51. Objective evidence proves these cyber attacks are real, not delusional:
   a. Router logs document 492 connected devices to Plaintiff's home network
   b. AT&T subpoena for internet service records returned no results after four attempts; a technically impossible result proving interference occurred
   c. FBI reports exist with documented IC3 (Internet Crime Complaint Center) submission IDs, verified through FOIA
   d. FOIA requests prove Plaintiff has clean record, contradicting false law enforcement report claiming Plaintiff had "history of deception and fraud"

52. Plaintiff reported these cyber attacks to appropriate authorities including local law enforcement and FBI, which is rational help-seeking behavior, not evidence of mental illness.

53. Plaintiff possesses technical knowledge regarding cybersecurity, networking, and electronic systems, having worked in related fields and maintained home network infrastructure.

MAY 1, 2025: MOBILE CRISIS EMPLOYEES ARRIVE WITH PREDETERMINED AGENDA

54. On May 1, 2025, at approximately 5:20 PM, Defendants PFEIL and MCGARTY (Mobile Crisis employees) arrived at Plaintiff's residence in response to a call.

55. From the moment of arrival, Defendants' conduct demonstrated a predetermined outcome to detain Plaintiff regardless of assessment findings:
   a. Parked at maximum distance from residence, at far end of neighbor's property, walking "through neighbor's yard" (Patient Advocate Lewis confirmed this in official records)
   b. If genuinely concerned about danger, standard officer safety protocol requires parking close for rapid intervention
   c. Maximum distance parking proves consciousness that danger assessment would be fabricated

56. Both of Plaintiff's parents were present during the entire assessment and can testify to all events, statements, and conduct.

57. Defendants conducted assessment while law enforcement was present on scene.

PLAINTIFF DEMONSTRATES RATIONAL THINKING AND KNOWLEDGE

58. During assessment, Plaintiff:
   a. Calmly explained the cyber attack situation with technical details
   b. Provided context for concerns (content injection, router anomalies, AT&T discrepancies)

    c. Asked Defendants about their cybersecurity expertise
    d. Defendants admitted "No" (both Mobile Crisis employees) that they had no expertise in cybersecurity
    e. Plaintiff requested professional investigation by qualified experts
    f. Defendants refused to investigate despite having law enforcement present
    g. Plaintiff stated he wanted to "sue the people involved in the cyber attacks"

59. Someone experiencing genuine delusions does not:
    A. Ask if evaluators are qualified to assess technical claims
    B. Offer objective evidence (router logs, FBI reports, FOIA results)
    C. Request professional investigation by qualified experts
    D. Acknowledge evaluators' limitations

60. This demonstrates rational, reality-based thinking contradicting Defendants' subsequent characterization as "delusional."

61. Plaintiff reported that his "brain cap," an EEG (electroencephalogram) monitoring device used for sleep studies and neurological monitoring, had been stolen as part of the targeting campaign. This is a legitimate medical device with documented medical purpose. Family witnesses confirm Plaintiff explained the brain cap theft and that this was a legitimate concern given the pattern of cyber attacks and targeting Plaintiff had been experiencing.

RETALIATION FOR THREATENING LITIGATION

62. In their own memorandum, Defendants reveal their true motivation, stating: "BHDD's mental health evaluators must be free to exercise their professional judgment without fear of the wrath of disgruntled and litigious patients."

63. This language reveals an institutional mindset that:
    a. Views exercise of the right to litigation as "wrath" rather than protected speech
    b. Characterizes citizens with legitimate complaints as "disgruntled"
    c. Treats "litigious" as a pejorative requiring "freedom" from such patients
    d. Admits to "fear" of litigation motivating official action

64. When Plaintiff stated he wanted to "sue the people involved in the cyber attacks," Defendants immediately became defensive and hostile.

65. Timeline proves retaliatory motive:
    a. Plaintiff threatens litigation: "I want to sue"
    b. Defendants respond by stating they need to make a phone call
    c. 15-minute coordination call occurs with Defendant GUERRIERO (supervisor/administrator)
    d. Immediately after the coordination call, Defendants inform family Plaintiff will be hospitalized
    e. This temporal proximity proves but-for causation: but for threatening litigation, detention would not have occurred

66. This is classic First Amendment retaliation: citizen threatens to sue government officials →
government officials immediately coordinate to punish citizen through psychiatric detention.

DEFENDANTS' OWN ASSESSMENT CONTRADICTS THEIR ACTIONS

67. Defendants completed Crisis Intervention Sheet documenting their clinical findings. This
document, which Defendants possess but concealed in state court proceedings, states:
SAFETY CONCERNS: NONE. See Exhibit A.

68. Defendants completed Service Log documenting:
    a. Emergency: N (No)
    b. Incarc: N (No basis for incarceration)
    c. After "Emergency: N" notation, the log states: "NO EMERGENCY." See Exhibit B.

69. These are Defendants' own documented findings, made contemporaneously during
assessment, proving:
    A. No safety concerns existed
    B. No emergency existed
    C. No basis for incarceration existed
    D. Defendants knew this at time of detention

PHYSICAL EVIDENCE PROVES CONSCIOUSNESS OF FABRICATION

70. If Defendants genuinely believed Plaintiff was dangerous, homicidal, suicidal, or
experiencing psychiatric emergency, they would have:
    a. Parked close to residence for rapid intervention (officer safety protocol)
    b. Maintained constant supervision (never leaving a dangerous person alone)
    c. Documented safety concerns (not "NONE")
    d. Documented emergency (not "N" and "NO EMERGENCY")
    e. Expedited removal (not extended preparation time)

71. What Defendants actually did:
    a. Parked at maximum distance (neighbor's property edge) proving no genuine safety concern
    b. Left Plaintiff alone unsupervised for 15+ minutes proving no genuine emergency
    c. Documented Safety Concerns: NONE contradicting subsequent "homicidal" claim
    d. Documented Emergency: N contradicting emergency hospitalization
    e. Gave Plaintiff time to change clothes, prepare belongings, and pack proving no urgency

72. This physical positioning and timing proves Defendants knew their danger assessment was
false. Their actions contradict their documented claims, demonstrating consciousness of
fabrication.

DEFENDANTS TOLD PARENTS THEY LACKED QUALIFICATIONS

73. When parents questioned the basis for hospitalization, Defendants stated: "He needs someone with more degrees than us."

74. This admission proves:
    a. Defendants knew they were not qualified to make psychiatric diagnosis
    b. Defendants knew Plaintiff needed evaluation by more qualified professional
    c. Despite knowing this, Defendants proceeded to coordinate involuntary commitment
    d. Defendants never ensured qualified professional actually evaluated Plaintiff

SYSTEMATIC FABRICATION OF ASSESSMENT RECORDS

75. Defendants fabricated multiple statements in assessment records to manufacture psychiatric emergency:

FABRICATION #1: "Sue" Changed to "Hurt"

76. Plaintiff stated: "I want to sue the people involved in the cyber attacks against me."

77. Family witnesses confirm Plaintiff said "sue" not "hurt." See Exhibits E-F

78. Defendants documented: Plaintiff wants to "hurt" people.

79. This deliberate word substitution converted civil litigation threat into violent intent, manufacturing homicidal ideation where none existed.

FABRICATION #2: Brain Cap Theft Reported, Documented as "Vase"

80. Plaintiff explained that his "brain cap" (EEG medical monitoring device used for sleep studies and neurological monitoring) had been stolen as part of the cyber attack campaign against him. This is a legitimate medical device with documented medical purpose.

81. Family witnesses confirm Plaintiff explained the brain cap theft and that this was a legitimate concern given the pattern of cyber attacks and targeting. See Exhibits E-F

82. Defendants documented: Plaintiff had "vase worth $10,000" stolen from him.

83. This fabrication is particularly egregious because:
    a. Plaintiff never said the word "vase"
    b. Plaintiff reported a theft of medical equipment, not a household item
    c. No reasonable person mishears "brain cap" as "vase", proving deliberate fabrication, not documentation error

d. Pattern of retaliatory fabrication serving coherent purpose (neutralize threat to their authority)

e. Supports false mental illness narrative through complete misrepresentation of what Plaintiff actually said

FABRICATION #3: "Responding to Internal Stimuli"

84. Defendants documented Plaintiff was "responding to internal stimuli"—clinical language meaning hallucinations (hearing voices, seeing things that aren't there).

85. Reality: Plaintiff was not hallucinating.

86. Family witnesses can testify Plaintiff responded only to actual conversation with family and Defendants, not to any internal stimuli. See Exhibits E-F

87. This is inventing severe mental illness symptoms (psychosis/hallucinations) that did not exist.

FABRICATION #4: "Sometimes Skips Meals"

88. Defendants documented Plaintiff "sometimes skips meals."

89. Reality:
   a. No one mentioned diet during assessment
   b. Family never stated this
   c. Plaintiff cooks meals regularly for household
   d. Plaintiff works out six days per week, requiring proper nutrition and regular eating. See Exhibits E-F

90. This is a complete invention with zero basis, added to build a false narrative of decline.

FABRICATION #5: Columbia Suicide Severity Rating Scale (SSRS) Falsified

91. The SSRS is a standardized suicide risk assessment consisting of specific yes/no questions. It is an objective screening instrument, not subjective clinical judgment.

92. Defendants falsified Plaintiff's responses to the SSRS, marking answers Plaintiff never gave.

93. Family members present during assessment can testify under oath that Plaintiff did not give the responses Defendants documented. See Exhibits E-F

94. Falsifying a standardized screening instrument is not "clinical judgment"—it is deliberate fraud.

95. This fabrication served to manufacture false "suicide risk" justifying detention.

FABRICATION #6: "Agitated" vs. "Upset"

96. Mother described Plaintiff as "upset" (normal emotional response to hate crime video content being injected onto his devices).

97. Defendants changed this to "agitated"—a clinical term suggesting psychiatric pathology. See Exhibits E-F

98. This transforms normal emotion into a psychiatric symptom.

ADDITIONAL FABRICATIONS (10+ Total)

99. Additional fabrications documented in assessment include:
   - "Homicidal" fabricated despite Safety Concerns: NONE documented
   - "Suicidal" fabricated via falsified SSRS
   - "Emergency" fabricated despite Emergency: N and "NO EMERGENCY" documented
   - "Basis for incarceration" fabricated despite Incarc: N documented
   - "Upset" changed to "agitated" to pathologize normal emotion
   - False "protocol" justification (Patient Advocate Lewis later admitted doesn't exist)
   - "Involuntarily committed" claimed despite diagnosis BLANK and unsigned

THE SMOKING GUN: PLBH PSYCHIATRIC HOSPITAL REFUSED ADMISSION

100. Defendants' Service Log contains devastating admission proving systematic conspiracy.

101. Service Log states: "Staffed w/PLBH for a direct admission but they stated they could not admit the pt w/o medical clearance. Transported to MUSC by CPD. Called and gave rapport to charge nurse."

102. Patrick B. Harris Psychiatric Hospital (PLBH) is Charleston's designated psychiatric facility with specialized expertise in psychiatric emergencies.

103. PLBH refused to admit Plaintiff, stating: "could not admit the pt w/o medical clearance."

104. This refusal proves:
   a. Psychiatric experts recognized no medical basis existed for admission
   b. Legal requirements for involuntary commitment were not met
   c. No physician had certified a need for psychiatric admission
   d. South Carolina Code §§ 44-17-410, 44-22-100 requirements were not satisfied

105. When an appropriate psychiatric hospital with specialized expertise refuses admission for lack of medical basis, the ethical response is to accept that professional judgment and release the patient.

106. Defendants' response was to forum-shop for a different facility that would accept, proving the outcome was predetermined regardless of professional medical judgment.

MULTI-ENTITY CONSPIRACY AND COORDINATION

107. After PLBH properly refused admission, Defendants intensified coordination efforts involving multiple governmental entities:

COORDINATION ELEMENT #1: Probate Court Contact

108. Defendants admitted in state court Motion to Dismiss that they coordinated with probate court "before assessment was complete."

109. This admission proves:
   a. Probate court was contacted before legal requirements were met
   b. Judicial officers coordinated ex parte with executive branch mobile crisis employees
   c. Outcome was predetermined before evaluation completed
   d. Systematic corruption of judicial process occurred

COORDINATION ELEMENT #2: 15-Minute Call After Litigation Threat

110. Immediately after Plaintiff threatened litigation, Defendants made a 15-minute phone call to Defendant GUERRIERO (Mobile Crisis Supervisor/administrator).

111. After this coordination call, Defendants announced Plaintiff would be hospitalized.

112. This proves coordination to achieve predetermined detention in response to litigation threat.

COORDINATION ELEMENT #3: MUSC Admission Through "Rapport"

113. Service Log states Defendants "gave rapport to charge nurse" at MUSC.

114. After PLBH psychiatric experts refused admission, Defendants used pre-existing "rapport" with MUSC charge nurse (John Doe Defendant) to facilitate admission at non-psychiatric facility.

115. This circumvented proper psychiatric evaluation channels.

COORDINATION ELEMENT #4: Law Enforcement Transport

116. Charleston Police Department transported Plaintiff, coordinating with Mobile Crisis employees despite their own findings of Safety Concerns: NONE and NO EMERGENCY.

THE PATTERN OF COORDINATION PROVES CONSPIRACY

117. Timeline of systematic coordination:
   a. Mobile Crisis employees arrive with predetermined agenda (maximum distance parking)
   b. Plaintiff threatens litigation ("sue")
   c. 15-minute coordination call to Defendant GUERRIERO
   d. Contact PLBH for direct psychiatric admission
   e. PLBH properly refuses ("could not admit without medical clearance")
   f. Defendants coordinate with probate court (admitted in their motion)
   g. Defendants coordinate with MUSC charge nurse ("gave rapport")
   h. Law enforcement coordinates transport
   i. Probate judge issues order without required physician certification
   j. All safeguards fail in same direction toward detention

118. This multi-entity coordination: Mobile Crisis employees + GUERRIERO + PLBH (properly refused) + probate court + MUSC charge nurse + probate judge, proves systematic conspiracy to achieve unlawful detention.

DECEPTIVE LANGUAGE TO CONCEAL TRUE NATURE

119. When taking Plaintiff, Defendants did not use words "involuntary commitment."

120. Defendants only told family: "He has to go with us" and "he needs to see someone with more degrees than us."

121. This deceptive practice:
   a. Obscured true nature of action (involuntary psychiatric commitment)
   b. Prevented family from understanding enough to object effectively
   c. Concealed both PLBH refusal and forum-shopping
   d. Proves consciousness of wrongdoing. If commitment was proper, why hide its nature?

122. "Involuntary commitment" triggers understanding of legal requirements (physician certification, court order, due process). By avoiding this language, Defendants concealed that legal safeguards were required but not followed.

THREE-STAGE FAILURE OF QUALIFIED EVALUATION

123. South Carolina law requires for involuntary commitment:
   a. Examination by qualified professional (psychiatrist or psychologist)
   b. Specific psychiatric diagnosis
   c. Signed certification

17

d. S.C. Code §§ 44-17-410, 44-22-100

124. None of these requirements were met at any stage.

STAGE 1: Mobile Crisis Employees (Not Qualified to Diagnose)

125. Mobile Crisis employees documented Safety Concerns: NONE and Emergency: N, yet recommended hospitalization.

126. Mobile Crisis employees told parents: "He needs someone with more degrees than us."

127. This admission proves Mobile Crisis employees knew they lacked qualifications to make psychiatric diagnosis.

128. Despite knowing this, they proceeded to coordinate commitment without qualified professional evaluation.

STAGE 2: MUSC 2am Evaluator (Qualifications Unknown)

129. MUSC evaluator identity not identified in records (John Doe Defendant MUSC Evaluator #1).

130. Evaluator heard Plaintiff's rational explanation.

131. Evaluator told Plaintiff: "You need someone with more experience than me."

132. This admission proves the 2am evaluator knew they lacked qualifications or experience to make psychiatric diagnosis.

133. Despite this admission, no more experienced professional was brought in to complete proper evaluation.

STAGE 3: MUSC 10am RN (Not Qualified to Diagnose)

134. Registered Nurses cannot make psychiatric diagnoses under South Carolina law.

135. RN (John Doe Defendant MUSC Evaluator #2) heard the same rational explanation.

136. RN left the diagnosis field BLANK.

137. RN did NOT sign an evaluation.

138. This proves even after overnight observation, no qualified professional would certify need for commitment because no basis existed.

139. At no stage did a qualified professional make psychiatric diagnosis supporting commitment.

140. Each stage deferred to supposedly more qualified evaluators, yet no qualified evaluator ever signed off, proving unlawful detention accomplished through multi-entity conspiracy.

NO INVOLUNTARY COMMITMENT EVER OCCURRED

141. Hospital records prove:
   a. Diagnosis field: BLANK
   b. Signature: NONE
   c. No commitment order entered
   d. No qualified professional certification
   e. Plaintiff released without any diagnosis. See Exhibit C.

142. Without qualified professional certification, commitment is void ab initio under South Carolina law.

143. This was unlawful detention, not healthcare.

STATE COURT FRAUD AND CONCEALMENT

144. Defendants moved to dismiss in state court (Charleston County Court of Common Pleas, Case No. 2025-CP-10-3621) claiming "professional judgment" entitled to qualified immunity.

145. Despite possessing all assessment records, Defendants deliberately concealed critical documents from state court:
   a. Crisis Intervention Sheet (Safety Concerns: NONE)
   b. Service Log (Emergency: N, PLBH refusal, "NO EMERGENCY")
   c. Complete assessment (showing "sue" to "hurt" fabrication)
   d. MUSC records (diagnosis BLANK, unsigned)
   e. Falsified SSRS
   f. Patient Advocate meeting notes (false "protocol")
   g. Parking documentation
   h. Phone records from coordination call
   i. Body camera footage

146. At the state court hearing on October 9, 2025, Defendants' counsel stated to the Court that Plaintiff, "Mr. Ndunda disputes, you know, the findings in his mental health evaluation, as I'm sure most people who are involuntarily committed do.."

147. This statement is false, as hospital records prove.

148. This false statement during oral argument on dispositive motion, combined with systematic concealment of contradictory evidence, constitutes fraud on the court.

A. The false "involuntary commitment" narrative has been repeated systematically across multiple occasions and by multiple actors:

FIRST INSTANCE: Defendants' Memorandum in Support, Page 11

- Written pleading filed with this Court on October 7, 2025
- Defense counsel wrote in their Memorandum in Support of Motion to Dismiss:

"...every person involuntarily committed does not believe and/or
   disagrees with findings in their evaluation..."

- Made with knowledge of contradictory hospital records (diagnosis BLANK, unsigned)

SECOND INSTANCE: State court hearing (October 9, 2025) - Defendants' counsel stated to the Court that Plaintiff, "Mr. Ndunda disputes, you know, the findings in his mental health evaluation, as I'm sure most people who are involuntarily committed do."

- This statement made during oral argument on dispositive motion

THIRD INSTANCE: Audio Recording 10/09/25 - Defendants' attorney stated: "disputed the results of my assessment, as most people who have been involuntarily committed do" - See Exhibit T (Audio Recording + Transcript)

FOURTH INSTANCE: Patient Advocate Records - Quality Improvement records state: "Citizen was involuntarily admitted to MUSC" - See Exhibit D

B. This pattern of repetition across multiple occasions and actors proves this is not mistake or misunderstanding—it is systematic institutional false narrative designed to: a. Undermine Plaintiff's credibility by creating psychiatric label b. Justify Defendants' conduct retroactively c. Conceal that no lawful commitment ever occurred d. Prevent Plaintiff from obtaining legal representation (ongoing harm).

C. Each repetition of this false narrative constitutes: a. Continuing defamation (Count X - IIED) b. Evidence of conspiracy (Count VI - § 1985) c. Fraud on the court (if made in legal proceedings) d. Obstruction of justice (preventing Plaintiff's access to counsel)

149. On October 13, 2025, Plaintiff filed Memorandum in Opposition documenting fraud on court with exhibits proving counsel's false statement.

150. On October 21, 2025, Plaintiff filed Emergency Motion for Sanctions, Adverse Inference, and Referral for Criminal Investigation, presenting comprehensive evidence of multi-entity conspiracy.

151. The state court indicated intent to grant dismissal despite these fraud allegations, demonstrating inadequacy of state court remedies and necessitating federal intervention.

PATIENT ADVOCATE COVER-UP

152. Plaintiff filed a complaint with Patient Advocate TIA LEWIS seeking investigation and remedy.

153. Instead of protecting Plaintiff's rights, Defendant Lewis engaged in cover-up:

FALSE "PROTOCOL" JUSTIFICATION

154. Patient Advocate Lewis initially claimed parking at maximum distance was per "protocol." See Exhibit D.

155. When Plaintiff challenged this and contacted the Columbia office, the Columbia Office confirmed: NO SUCH PROTOCOL EXISTS.

156. Patient Advocate Lewis admitted verbally no protocol exists.

157. Patient Advocate Lewis's final written letter reverted to claiming parking was "according to protocol."

158. This fabrication proves consciousness that the parking position was damning. If innocent, no false justification needed.

SELECTIVE OMISSION OF DAMNING EVIDENCE

159. Patient Advocate Lewis necessarily reviewed:
   a. Assessment showing "HOMICIDAL" marking
   b. Crisis Intervention Sheet showing Safety Concerns: NONE
   c. Service Log showing Emergency: N and "NO EMERGENCY"
   d. Parking at neighbor's yard
   e. Both parents' statements: "NOT emergency"

160. In an official response, Patient Advocate Lewis cited minor complaints (not reporting hate crime, being gaslit, lack of privacy).

161. Patient Advocate Lewis did NOT cite the core fabrications: "homicidal" + falsified suicide rating scale + Safety Concerns: NONE + Emergency: N + maximum distance parking + 15+ minutes alone + "sue" to "hurt."

162. This selective omission proves, even the Patient Advocate trying to defend Defendants could not defend the core fabrication, so they didn't mention it at all.

163. This is admission through omission and institutional cover-up rather than patient advocacy.

PERPETUATION OF FALSE COMMITMENT NARRATIVE

164. Patient Advocate Lewis's Quality Improvement records state: "Citizen was involuntarily admitted to MUSC." See Exhibit D.

165. This perpetuates false narrative despite records proving diagnosis BLANK and unsigned.

166. Use of "citizen" terminology (not "patient") is admission this was state action against citizen, not medical treatment. Patient Advocate Lewis's emails prove consciousness of wrongdoing and admission that no lawful commitment occurred:

FIRST EMAIL (May 14, 2025 - 9 days after grievance):
Lewis stated she would "work on getting clarity on if a record can be sealed." See Exhibit R. This statement proves: a. Lewis knew records would be damaging (why seal if legitimate?) b. Lewis was coordinating with others to conceal evidence c. Lewis acted immediately after grievance to prevent exposure d. Records exist that contradict Defendants' claims

SECOND EMAIL (June 3, 2025):
Lewis stated: "Per Charleston Dorchester MHC policy, we do not pay for MUSC ER admissions." See Exhibit R.
This is an admission that the Plaintiff was NOT a patient under involuntary commitment because: a. If lawful commitment: Charleston Dorchester MHC financially responsible b. Lewis stating "not our problem" = admission it wasn't their commitment c. Referring to MUSC as "ER admission" not "commitment" = admission of true nature d. Contradicts systematic false "involuntary commitment" narrative
Patient Advocate using the term "ER admissions" instead of "commitment" or "patient" is tacit admission that Plaintiff was an emergency room visitor, not a committed patient.
Lewis attempts to deflect by suggesting MUSC committed Plaintiff ("contact MUSC...their patient advocacy process")(Exhibit R), but: a. MUSC records show diagnosis BLANK and unsigned (Exhibit C) b. No MUSC commitment order exists c. Lewis cannot point to ANY entity that lawfully committed Plaintiff d. This deflection proves NO lawful commitment occurred anywhere.
Lewis's contradictory positions prove fabrication: - To Plaintiff: "Not our patient, contact MUSC" - In records: "Citizen was involuntarily admitted" - To state court: "Involuntarily committed" Which entity committed Plaintiff? Lewis cannot answer because NONE did lawfully.

ONGOING RETALIATION AND OBSTRUCTION OF JUSTICE

167. From May 1, 2025 to present, Plaintiff has been the target of ongoing retaliation and obstruction:

CYBER ATTACKS AND ELECTRONIC INTERFERENCE

168. Sophisticated cyber attacks continue, preventing Plaintiff from:
   a. Obtaining legal representation
   b. Effectively pursuing litigation
   c. Gathering and preserving evidence
   d. Communicating securely with potential witnesses

169. These attacks constitute continuing civil rights violations and obstruction of justice.

DEFAMATION CAMPAIGN

170. Defendants have engaged in a defamation campaign characterizing Plaintiff as "mentally ill" and "delusional" despite:
   a. Objective evidence proving Plaintiff's claims accurate
   b. Their own records contradicting emergency claims
   c. PLBH refusal proving no medical basis
   d. No qualified professional ever certifying need

171. This defamation has prevented Plaintiff from obtaining legal representation—multiple attorneys have declined representation after being exposed to Defendants' false narrative.
A. The defamation campaign includes the Defendants' attorney repeating the false "involuntary commitment" narrative even in legal proceedings.
B. On 10/09/25, Defendants' attorney stated in Motion to Dismiss Hearing: "Mr. Ndunda disputes, you know, the findings in his mental health evaluation, as I'm sure most people who are involuntarily committed do." See Exhibit T (Audio Recording + Transcript).
C. This statement is false because: a. Diagnosis field on evaluation form: BLANK (Exhibit C) b. Evaluation form: UNSIGNED (Exhibit C) c. No commitment order exists in records d. Plaintiff released with NO DIAGNOSIS e. Without qualified professional certification and valid commitment order, no "involuntary commitment" occurred
D. That Defendants' own attorney perpetuates this false narrative proves: a. The defamation is institutional policy, not isolated incident b. The false narrative serves Defendants' litigation strategy c. The narrative has achieved its purpose: preventing legal representation d. The harm is ongoing and will continue without injunctive relief

EVIDENCE DESTRUCTION

172. AT&T subpoena for internet service records returned no results after four attempts—technically impossible result proving:
   a. Records existed but were destroyed or concealed
   b. Interference with evidence gathering
   c. Obstruction of Plaintiff's ability to prove cyber attacks

173. Body camera footage from law enforcement present during May 1, 2025 incident either:
   a. Exists and is being concealed (spoliation), or
   b. Was never created despite standard protocols (conspiracy to prevent documentation)

CONTINUING PATTERN

174. This pattern extends from May 1, 2025 (initial retaliation), through Patient Advocate meetings (false "protocol"), through state court proceedings (concealment and false statements), to present (ongoing cyber attacks and defamation).

175. The retaliation is ongoing, systematic, and designed to prevent Plaintiff from vindicating constitutional rights.

========================================
COUNT I
MUNICIPAL LIABILITY UNDER MONELL V. DEPARTMENT OF SOCIAL SERVICES
(Against Charleston/Dorchester Mental Health Center, SC Dept. of Mental Health, Charleston County, and MUSC)
========================================

176. Plaintiff incorporates by reference all preceding paragraphs.

177. Under Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978), municipal liability under 42 U.S.C. § 1983 attaches only when execution of a government's policy or custom inflicts the constitutional injury.

178. Municipalities cannot be held liable under respondeat superior. Id. at 691.

POLICY/CUSTOM #1: Rubber-Stamping Commitment Orders Without Judicial Review

179. Charleston County, through its Probate Court, maintains an official policy or widespread custom of rubber-stamping involuntary commitment requests from Mobile Crisis employees without meaningful judicial review.

180. This policy or custom is evidenced by:
   a. Probate judges issuing commitment orders without verifying that a qualified professional evaluation occurred;
   b. Probate judges issuing orders without confirming physician certification exists as required by S.C. Code § 44-17-580;
   c. Probate judges coordinating ex parte with Mobile Crisis employees before legal requirements are satisfied;
   d. A pattern of predetermined outcomes where judicial review is perfunctory;
   e. Systematic failure to conduct independent review of medical necessity;
   f. John Doe Probate Judge's coordination with Defendants PFEIL and MCGARTY on May 1, 2025, before any qualified professional evaluation occurred.

181. This policy or custom directly caused the violation of Plaintiff's constitutional rights by facilitating his unlawful detention without due process.

182. The Probate Court judge who issued the order is a final policymaker for Charleston County with respect to involuntary commitment decisions under Pembaur v. City of Cincinnati, 475 U.S. 469 (1986), making the County liable under Monell.

POLICY/CUSTOM #2: Inadequate Training in Constitutional Requirements

183. Under City of Canton v. Harris, 489 U.S. 378 (1989), failure to train employees can constitute deliberate indifference when:
   a. The need for training is obvious;
   b. The inadequacy is likely to result in constitutional violations; and
   c. The municipality fails to act despite this knowledge.

184. Defendants SC DEPARTMENT OF MENTAL HEALTH and CHARLESTON/DORCHESTER MENTAL HEALTH CENTER have failed to train employees that:
   a. Retaliation for threatening litigation violates the First Amendment;
   b. Fabricating evidence to justify detention violates the Fourth Amendment;
   c. "Litigious patients" have constitutional rights that cannot be violated to protect government employees from accountability;
   d. Assessment forms must be completed honestly, not fabricated to achieve predetermined outcomes.

185. The need for such training is obvious—Defendants' own memorandum reveals the institutional mindset causing constitutional violations: "BHDD's mental health evaluators must be free to exercise their professional judgment without fear of the wrath of disgruntled and litigious patients."

186. This language proves that institutional policy treats citizens who threaten litigation as problems requiring "freedom" from accountability rather than as citizens exercising constitutional rights.

187. Defendants SC DEPT OF MENTAL HEALTH and CHARLESTON/DORCHESTER MENTAL HEALTH maintain policies or customs of:
   a. Failing to adequately train Mobile Crisis employees in constitutional requirements and legal standards for involuntary commitment;
   b. Failing to supervise assessment practices to prevent fabrication and retaliation;
   c. Allowing Mobile Crisis employees to make commitment recommendations without qualified professional oversight;
   d. Permitting fabrication and falsification of records without accountability or disciplinary action;
   e. Treating threats of litigation as grounds for psychiatric intervention rather than protected First Amendment activity.

188. This deliberate indifference to training and supervision is evidenced by:
   a. Mobile Crisis employees admitting "He needs someone with more degrees than us" yet proceeding anyway, demonstrating awareness that they lack qualifications;
   b. Systematic fabrication of records (SSRS, changing "sue" to "hurt," inventing nonexistent "protocol");
   c. Complete absence of disciplinary action despite documented violations;

d. Supervisor Defendant GUERRIERO's participation in the 15-minute coordination call that resulted in retaliation rather than proper clinical assessment;

e. Patient Advocate LEWIS covering up violations rather than investigating them, demonstrating institutional policy of protecting wrongdoers rather than remedying constitutional violations.

189. The inadequacy of training was likely to—and did—result in constitutional violations. When employees lack training in basic constitutional protections, violations are the "plainly obvious consequence." Connick v. Thompson, 563 U.S. 51, 64 (2011).

190. Policymakers knew or should have known of this inadequacy but failed to act, demonstrating deliberate indifference.

POLICY/CUSTOM #3: Institutional Policy of Retaliating Against "Litigious Patients"

191. Defendants' own memorandum reveals an institutional policy or custom of viewing citizens who threaten litigation as problems requiring neutralization.

192. Defendants stated: "BHDD's mental health evaluators must be free to exercise their professional judgment without fear of the wrath of disgruntled and litigious patients."

193. This language reveals an institutional mindset that:
   a. Views exercise of the right to litigation as "wrath" rather than protected speech;
   b. Characterizes citizens with legitimate complaints as "disgruntled";
   c. Treats "litigious" as a pejorative requiring "freedom" from such patients;
   d. Admits to "fear" of litigation motivating official action.

194. This is direct evidence of a policy or custom under which Defendants act from "fear" of litigation threats—personal motivation, not occupational purpose.

195. When an institution admits its employees must be "free" from "litigious patients," that institution has created a custom of retaliating against those who exercise First Amendment rights.

POLICY/CUSTOM #4: Accepting Improper Commitments Through "Rapport" Rather Than Medical Judgment

196. Defendant MUSC maintains a policy or custom of accepting involuntary commitments coordinated through "rapport" with Mobile Crisis employees without independent verification of:
   a. Whether proper psychiatric evaluation occurred;
   b. Whether a qualified professional certified the need for commitment;
   c. Whether legal requirements were satisfied;
   d. Whether the referring psychiatric facility properly evaluated the patient.

197. This policy or custom is evidenced by:

a. MUSC accepting Plaintiff after Palmetto Lowcountry Behavioral Health (PLBH) properly refused admission for lack of medical clearance;

b. "Rapport" between MUSC charge nurse and Mobile Crisis employees facilitating improper admission;

c. Two MUSC evaluators admitting they had no expertise in the subject matter of Plaintiff's concerns;

d. MUSC evaluators deferring to Mobile Crisis assessment despite its obvious fabrications;

e. Final diagnosis field left BLANK and unsigned on MUSC evaluation form;

f. No qualified professional making any diagnosis during Plaintiff's 20-hour detention;

g. Plaintiff being released with no diagnosis, confirming no medical basis ever existed.

198. This policy of accepting commitments based on "rapport" rather than independent medical judgment directly caused Plaintiff's unlawful detention at MUSC.

POLICY/CUSTOM #5: Failure to Investigate and Discipline Known Violations

199. Defendants maintain a policy or custom of failing to investigate complaints and failing to discipline employees who violate constitutional rights.

200. This is demonstrated by:

a. Patient Advocate LEWIS's response claiming parking at neighbor's property was "protocol," a fabrication later contradicted by the Columbia office admitting no such protocol exists;

b. Patient Advocate defending the fabricated assessment rather than investigating it;

c. No disciplinary action against PFEIL, MCGARTY, or GUERRIERO despite documented violations;

d. Institutional cover-up through the Patient Advocate system;

e. The Patient Advocate system functioning as institutional defender rather than patient advocate.

201. This failure to investigate and discipline creates a custom of tolerance for constitutional violations, encouraging future misconduct.

DELIBERATE INDIFFERENCE TO CONSTITUTIONAL RIGHTS

202. Policymakers for each governmental entity were deliberately indifferent to known or obvious risks of constitutional violations by:

a. Failing to implement proper oversight of the commitment process despite known risks of abuse;

b. Permitting multi-entity coordination without safeguards against collusion;

c. Allowing "forum-shopping" after one psychiatric hospital properly refuses admission;

d. Failing to discipline employees who fabricate records, creating tolerance for misconduct;

e. Operating a Patient Advocate system that defends violations rather than remedying them;

f. Permitting false statements to courts without consequences;

g. Failing to train employees that retaliation for litigation threats is unconstitutional;

h. Maintaining a culture where "litigious patients" are viewed as threats requiring neutralization.

203. Under Board of County Commissioners v. Brown, 520 U.S. 397 (1997), a single incident can establish municipal liability when it results from a policy of inadequate training or supervision that reflects deliberate indifference.

204. Here, the pattern of violations demonstrates deliberate indifference:

a. Over ten documented fabrications;

b. Admission of no expertise yet proceeding anyway;

c. 15-minute coordination call with supervisor to authorize retaliation;

d. Physical evidence of consciousness of falsity (parking at maximum distance, 15+ minutes unsupervised);

e. Multi-entity conspiracy to circumvent legal safeguards;

f. Complete absence of qualified diagnosis despite 20-hour detention;

g. Institutional cover-up rather than investigation.

205. This deliberate indifference directly and proximately caused the violations of Plaintiff's constitutional rights alleged herein.

CAUSATION

206. The policies, customs, and deliberate indifference described above were the moving force behind the constitutional violations suffered by Plaintiff. Monell, 436 U.S. at 694.

207. But for these policies and customs:

a. The Probate Court would have conducted meaningful review rather than rubber-stamping;

b. Mobile Crisis employees would have been properly trained not to retaliate;

c. Supervisor would not have authorized detention for personal rather than medical reasons;

d. MUSC would have independently verified the medical necessity rather than relying on "rapport";

e. The Patient Advocate would have investigated rather than covered up the violations.

208. These policies and customs created the conditions that made Plaintiff's constitutional violations inevitable.

209. Therefore, governmental entity Defendants CHARLESTON/DORCHESTER MENTAL HEALTH CENTER, SOUTH CAROLINA DEPARTMENT OF MENTAL HEALTH, CHARLESTON COUNTY, and MUSC are liable under Monell for the constitutional violations alleged herein.

==========================================

COUNT II

42 U.S.C. § 1983 - FIRST AMENDMENT RETALIATION

(Against All Individual Defendants)
=========================================

210. Plaintiff incorporates by reference all preceding paragraphs.

211. The First Amendment protects the right to petition the government for redress of grievances, including threatening litigation. U.S. Const. amend. I.

LEGAL STANDARD FOR FIRST AMENDMENT RETALIATION

212. Under Hartman v. Moore, 547 U.S. 250, 256 (2006), to establish First Amendment retaliation, Plaintiff must show:
   (1) Protected activity (threatening litigation);
   (2) Adverse action (psychiatric detention);
   (3) Causal connection between protected activity and adverse action;
   (4) Lack of probable cause for the adverse action.

213. Plaintiff satisfies all elements:

ELEMENT 1: PROTECTED ACTIVITY

214. Plaintiff engaged in protected First Amendment activity by stating: "I want to sue the people involved in the cyber attacks against me."

215. This statement invokes the Petition Clause of the First Amendment, which protects "the right of the people...to petition the Government for a redress of grievances." U.S. Const. amend. I.

216. Threatening to file a lawsuit is quintessential protected speech under the Petition Clause. BE & K Constr. Co. v. NLRB, 536 U.S. 516, 525 (2002).

217. Additional protected activity included:
   a. Asking government officials about their qualifications ("Do you have cybersecurity expertise?");
   b. Challenging government officials' competence;
   c. Exposing their lack of expertise;
   d. Requesting qualified professionals to conduct investigation.

ELEMENT 2: ADVERSE ACTION

218. Defendants took adverse action against Plaintiff by:
   a. Labeling him "threat to self and others" immediately after litigation threat;
   b. Fabricating evidence to manufacture justification for detention;
   c. Coordinating 15-minute phone call to authorize retaliation;

d. Detaining him involuntarily for approximately 20 hours;

e. Creating false psychiatric record to undermine future litigation credibility;

f. Publicly humiliating him through strategic positioning for neighbor visibility.

219. Involuntary psychiatric detention is a severe adverse action that would deter a person of ordinary firmness from exercising First Amendment rights. Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019).

ELEMENT 3: CAUSAL CONNECTION

220. The temporal proximity and sequence of events establishes but-for causation:

TIMELINE:
 - Plaintiff demonstrates technical knowledge Defendants lack;
 - Plaintiff exposes Defendants' inadequacy by asking about expertise they don't possess;
 - Plaintiff states: "I want to sue the people involved in the cyber attacks";
 - Defendants immediately become defensive and hostile;
 - Defendants make 15-minute coordination call with supervisor GUERRIERO;
 - Immediately after coordination call, Defendants announce Plaintiff will be hospitalized;
 - Defendants fabricate evidence to justify detention ("sue" → "hurt");
 - Defendants proceed despite their own findings: "Safety Concerns: NONE" and "Emergency: N."

221. This temporal proximity—threat of litigation followed immediately by coordination call followed immediately by detention decision—establishes the causal connection. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

222. Defendants' own memorandum language proves retaliatory motive: "BHDD's mental health evaluators must be free to exercise their professional judgment without fear of the wrath of disgruntled and litigious patients."

223. This language reveals that Defendants:

a. View litigation threats as "wrath" requiring "freedom" from accountability;

b. Characterize citizens exercising rights as "disgruntled";

c. Treat "litigious" as negative trait requiring neutralization;

d. Admit "fear" of litigation motivates their actions.

224. When government officials admit acting from "fear" of litigation, that is confession of retaliatory motive.

ELEMENT 4: LACK OF PROBABLE CAUSE

225. Defendants lacked probable cause for the detention because:

a. Their own contemporaneous documentation stated "Safety Concerns: NONE";

30

b. Their own contemporaneous documentation stated "Emergency: N";

c. Patrick B. Harris Psychiatric Hospital refused admission for "lack of medical clearance";

d. No qualified professional ever certified a need for commitment;

e. Final diagnosis was left BLANK and unsigned;

f. Plaintiff was released with no diagnosis, confirming no medical basis existed.

226. The lack of probable cause is proven by Defendants' own actions:

a. Parking at maximum distance (proves knew danger claim false);

b. Leaving Plaintiff alone 15+ minutes unsupervised (proves knew emergency claim false);

c. Giving Plaintiff time to change clothes and pack (proves no urgency);

d. Documenting contradictory findings (Safety Concerns: NONE vs. threat claim).

227. Under Reichle v. Howards, 566 U.S. 658, 668 (2012), the absence of probable cause is strong evidence of retaliatory motive.

228. Here, not only did probable cause not exist, but Defendants knew it didn't exist, as proven by their own documented findings and physical positioning.

BUT-FOR CAUSATION PROVEN

229. But for Plaintiff's threat to sue, the detention would not have occurred. The sequence proves this:

- Before litigation threat: Assessment ongoing, no detention decision
- Litigation threat made: "I want to sue"
- Immediately after: 15-minute coordination call
- Immediately after call: Detention decision announced
- No change in clinical findings: Still "Safety Concerns: NONE"

230. The only variable that changed was Plaintiff's statement threatening litigation. That statement triggered the coordination call, which triggered the detention decision.

231. This is textbook First Amendment retaliation in violation of clearly established constitutional rights.

232. The retaliation would chill a person of ordinary firmness from exercising First Amendment rights.

233. No reasonable official could believe detention of citizens for threatening litigation is lawful.

234. Individual Defendants are liable in their personal capacities for damages for violating Plaintiff's First Amendment rights.

```
========================================
```
COUNT III
42 U.S.C. § 1983 - FOURTH AMENDMENT VIOLATION
(Unlawful Seizure Based on Fabricated Evidence)
(Against All Individual Defendants)
```
========================================
```

235. Plaintiff incorporates by reference all preceding paragraphs.

236. The Fourth Amendment protects against unreasonable seizures. U.S. Const. amend. IV.

LEGAL STANDARD FOR FOURTH AMENDMENT VIOLATIONS

237. Involuntary psychiatric detention is a seizure within the meaning of the Fourth Amendment. Zinermon v. Burch, 494 U.S. 113, 125 (1990).

238. Under the Fourth Amendment, a seizure is unreasonable when:
    (1) It is not supported by probable cause; or
    (2) It is based on fabricated evidence; or
    (3) It is accomplished through means that "shock the conscience."

239. Plaintiff's seizure violated the Fourth Amendment on all three grounds:

NO PROBABLE CAUSE

240. Probable cause for involuntary psychiatric detention requires reason to believe the person presents imminent danger to self or others or is unable to care for self due to mental illness.

241. Defendants lacked probable cause because:
    a. Their own assessment documented "Safety Concerns: NONE";
    b. Their own assessment documented "Emergency: N";
    c. Both parents explicitly stated "This is NOT an emergency";
    d. Psychiatric hospital (PLBH) refused admission for lack of medical basis;
    e. No qualified professional ever certified danger or mental illness;
    f. Diagnosis left BLANK proves no qualified professional would certify.

SEIZURE BASED ON FABRICATED EVIDENCE

242. Under Whiteley v. Warden, 401 U.S. 560, 568 (1971), an arrest based on fabricated evidence violates the Fourth Amendment.

243. Defendants fabricated evidence to justify the seizure:
    a. Changed "sue" to "hurt" to manufacture threat;
    b. Changed "brain cap" to "vase" to manufacture delusion;

   c. Invented "responding to internal stimuli" (hallucinations that didn't occur);
   d. Falsified standardized SSRS instrument with answers Plaintiff never gave;
   e. Documented "agitated" when parents said "upset";
   f. Documented emergency when their own form stated "Emergency: N";
   g. Claimed danger when their own form stated "Safety Concerns: NONE."

244. This pattern of systematic fabrication—over ten specific lies—converted a non-emergency situation into false justification for seizure.

CONSCIENCE-SHOCKING CONDUCT

245. Under County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998), conduct "shocks the conscience" when it is arbitrary in the constitutional sense.

246. Defendants' conduct shocks the conscience:
   a. Fabricating psychiatric emergency to retaliate for threatening litigation;
   b. Weaponizing the mental health system to punish exercise of First Amendment rights;
   c. Parking at maximum distance to create appearance of danger while knowing claim was false;
   d. Coordinating across multiple governmental entities to circumvent legal safeguards;
   e. Forum-shopping after psychiatric experts properly refused admission;
   f. Creating false psychiatric record with lasting impact on Plaintiff's credibility and liberty;
   g. Admitting lack of expertise yet proceeding anyway;
   h. Institutional cover-up through Patient Advocate system defending violations.

247. When government officials deliberately fabricate psychiatric assessments to punish citizens for threatening litigation, using the power of the state to deprive liberty based on lies, that conduct shocks the conscience and violates the Fourth Amendment.

PHYSICAL EVIDENCE PROVES UNREASONABLENESS

248. The unreasonableness of the seizure is proven by Defendants' own physical positioning and timing:
   a. If genuinely believed Plaintiff dangerous: Would park close for rapid intervention;
   b. Actually parked: Maximum distance at the far end of neighbor's property;
   c. If genuinely believed psychiatric emergency: Would maintain constant supervision;
   d. Actually did: Left Plaintiff alone unsupervised for 15+ minutes;
   e. If genuinely believed urgent: Would expedite removal;
   f. Actually did: Gave Plaintiff time to change clothes and pack belongings.

249. These actions are physically incompatible with a reasonable belief in danger or emergency, proving the seizure was pretextual and unconstitutional.

250. Individual Defendants are liable in their personal capacities for damages for violating Plaintiff's Fourth Amendment rights.

==========================================
COUNT IV
42 U.S.C. § 1983 - FOURTEENTH AMENDMENT VIOLATION
(Substantive and Procedural Due Process)
(Against All Individual Defendants)
==========================================

251. Plaintiff incorporates by reference all preceding paragraphs.

252. The Fourteenth Amendment prohibits states from depriving any person of liberty without due process of law. U.S. Const. amend. XIV, § 1.

LEGAL STANDARD FOR FOURTEENTH AMENDMENT DUE PROCESS VIOLATIONS

253. Civil commitment constitutes a "massive curtailment of liberty." Vitek v. Jones, 445 U.S. 480, 491 (1980).

254. Under Addington v. Texas, 441 U.S. 418, 425-27 (1979), civil commitment requires:
   (1) Clear and convincing evidence of mental illness and dangerousness;
   (2) Procedural due process protections including notice and hearing;
   (3) Examination by qualified professionals;
   (4) Specific findings supporting commitment.

255. Under Mathews v. Eldridge, 424 U.S. 319, 335 (1976), the court weighs:
   (1) Private interest affected (liberty—the highest interest);
   (2) Risk of erroneous deprivation (high when based on fabrication);
   (3) Government's interest (cannot justify deprivation without procedural safeguards).

PROCEDURAL DUE PROCESS VIOLATIONS

256. Defendants violated Plaintiff's procedural due process rights by depriving him of:

NOTICE
   a. No notice of specific charges or clinical findings;
   b. Deceptive language ("He has to go with us") instead of "involuntary commitment";
   c. Concealed that legal commitment process was occurring;
   d. Family not informed of PLBH refusal;
   e. No opportunity to understand or contest the basis for detention.

HEARING
   f. No meaningful hearing before neutral decisionmaker;

34

g. Probate court coordinated ex parte with Mobile Crisis employees;

h. Court contacted before assessment complete;

i. No opportunity to present evidence or witnesses;

j. No opportunity to cross-examine or challenge fabrications;

k. Rubber-stamp approval without independent review.

QUALIFIED PROFESSIONAL EVALUATION

l. Mobile Crisis employees admitted "He needs someone with more degrees than us";

m. 2am evaluator told Plaintiff "You need someone with more experience than me";

n. 10am RN not qualified to make psychiatric diagnoses;

o. No psychiatrist or qualified psychologist ever evaluated Plaintiff;

p. Diagnosis left BLANK and unsigned proves no qualified professional would certify;

q. Released with no diagnosis confirms no qualified evaluation occurred.

SPECIFIC FINDINGS

r. No specific psychiatric diagnosis ever made;

s. No findings of mental illness documented;

t. No findings of dangerousness supported by evidence;

u. Findings contradicted by Defendants' own records (Safety Concerns: NONE).

SUBSTANTIVE DUE PROCESS VIOLATIONS

257. Even with procedural protections, the commitment would violate substantive due process because it was based on:

a. Retaliation for protected speech, not medical necessity;

b. Fabricated evidence, not honest assessment;

c. Personal motivation ("fear of litigious patients"), not legitimate government interest;

d. Punishment for exercising constitutional rights, not protection of public health.

258. Under Foucha v. Louisiana, 504 U.S. 71, 80 (1992), due process requires proof of both mental illness and dangerousness.

259. Here, there was no proof of either:

a. Mental illness: Diagnosis BLANK, no qualified professional certified;

b. Dangerousness: Defendants' own records state "Safety Concerns: NONE."

260. When government officials detain a citizen based on fabricated psychiatric assessments to punish exercise of First Amendment rights, without qualified professional evaluation, without notice or hearing, and without proof of either mental illness or dangerousness, they violate both procedural and substantive due process under the Fourteenth Amendment.

CONTINUING VIOLATION

261. The due process violation continues through:

a. False psychiatric record with lasting impact on Plaintiff's credibility;
b. Ongoing defamation preventing legal representation;
c. Institutional perpetuation of false "involuntary commitment" narrative;
d. Refusal to correct or expunge false records.

262. Individual Defendants are liable in their personal capacities for damages for violating Plaintiff's Fourteenth Amendment rights to procedural and substantive due process.

============================================
COUNT V
SUPERVISORY LIABILITY UNDER 42 U.S.C. § 1983
(Against Defendant CECILE GUERRIERO)
============================================

263. Plaintiff incorporates by reference all preceding paragraphs.

264. Defendant GUERRIERO, as Mobile Crisis Supervisor for Charleston/Dorchester Mental Health Center, is liable under 42 U.S.C. § 1983 for violations of Plaintiff's constitutional rights through:
a. Direct participation in constitutional violations;
b. Failure to supervise subordinates; and
c. Creating/maintaining policies that caused the violations.

DIRECT PARTICIPATION IN CONSTITUTIONAL VIOLATIONS

265. Defendant GUERRIERO directly participated in the constitutional violations through the 15-minute coordination call with subordinates PFEIL and MCGARTY immediately after Plaintiff threatened litigation.

266. Under Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009), supervisors are liable under § 1983 when they are "personally involved" in the constitutional violations.

267. The 15-minute coordination call is direct evidence of GUERRIERO's personal participation:
  a. Subordinates PFEIL and MCGARTY called GUERRIERO immediately after Plaintiff stated "I want to sue";
  b. The call lasted approximately 15 minutes, demonstrating substantive coordination rather than brief consultation;
  c. Immediately following this call, subordinates announced Plaintiff would be hospitalized;
  d. The temporal proximity (litigation threat → coordination call → detention decision) proves the call's purpose was coordinating retaliation;
  e. GUERRIERO authorized the detention despite subordinates' own documented findings of "Safety Concerns: NONE" and "Emergency: N."

268. As supervisor, GUERRIERO had authority to direct subordinates' actions and prevent the constitutional violations. Instead, GUERRIERO authorized and facilitated the violations.

FAILURE TO SUPERVISE SUBORDINATES

269. Defendant GUERRIERO failed to properly supervise subordinates PFEIL and MCGARTY, knowing or having reason to know they were:
   a. Fabricating assessment records to justify unlawful detention;
   b. Retaliating against a citizen for threatening litigation;
   c. Proceeding with commitment despite admitting lack of expertise ("He needs someone with more degrees than us");
   d. Parking at maximum distance while claiming danger, proving consciousness of fabrication;
   e. Documenting "Safety Concerns: NONE" yet recommending hospitalization.

270. GUERRIERO had a duty to:
   a. Ensure subordinates conducted honest assessments;
   b. Prevent retaliation for exercise of First Amendment rights;
   c. Verify legal requirements were met before authorizing commitment;
   d. Discipline subordinates who fabricate records;
   e. Ensure commitment recommendations were based on medical necessity, not retaliation.

271. GUERRIERO's failure to supervise despite knowledge or reason to know of constitutional violations constitutes deliberate indifference under City of Canton v. Harris, 489 U.S. 378 (1989).

CREATING/MAINTAINING POLICIES CAUSING VIOLATIONS

272. As Mobile Crisis Supervisor, GUERRIERO created, maintained, or failed to correct policies and practices that directly caused Plaintiff's constitutional violations:
   a. Policy or practice of treating "litigious patients" as threats requiring neutralization rather than citizens exercising rights;
   b. Policy or practice of permitting fabrication of assessment records without accountability;
   c. Policy or practice of authorizing commitments based on retaliation rather than medical necessity;
   d. Policy or practice of failing to ensure qualified professional evaluations before recommending commitment;
   e. Policy or practice of coordinating commitment decisions administratively rather than clinically.

273. The 15-minute coordination call demonstrates that commitment decisions were made administratively (by supervisor GUERRIERO) rather than clinically (by qualified professionals evaluating Plaintiff).

274. When a supervisor participates directly in constitutional violations, fails to supervise subordinates engaging in violations, and maintains policies causing violations, the supervisor is personally liable under § 1983. Iqbal, 556 U.S. at 676.

275. Therefore, Defendant GUERRIERO is liable in her personal capacity for violations of Plaintiff's First, Fourth, and Fourteenth Amendment rights.

========================================
COUNT VI
18 U.S.C. § 1985(3) - CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS
(Against All Defendants)
========================================

276. Plaintiff incorporates by reference all preceding paragraphs.

277. Two or more persons conspired to deprive Plaintiff of equal protection of laws and equal privileges and immunities under laws.

278. The conspiracy involved:
   a. Mobile Crisis employees, PFEIL and MCGARTY
   b. Mobile Crisis Supervisor GUERRIERO (received coordination call)
   c. John Doe Probate Judge who coordinated ex parte
   d. John Doe MUSC charge nurse who facilitated admission through "rapport"
   e. John Doe MUSC evaluators who left diagnosis blank/unsigned
   f. Law enforcement who transported despite Safety Concerns: NONE
   g. Patient Advocate LEWIS who engaged in cover-up
   h. John Doe Defendants 1-5

279. Conspirators agreed and coordinated to:
   a. Detain Plaintiff in retaliation for threatening litigation
   b. Fabricate medical justification for unlawful detention
   c. Forum-shop after the psychiatric hospital properly refused
   d. Procure probate court order through fraud
   e. Bypass legal requirements for involuntary commitment
   f. Cover up constitutional violations through institutional fraud

280. Overt acts in furtherance of conspiracy include:
   a. 15-minute coordination call to GUERRIERO after litigation threat
   b. Contacting PLBH for direct admission
   c. When PLBH refused, contacting probate court before requirements met
   d. Coordinating with MUSC charge nurse for admission
   e. Fabricating assessment records
   f. Falsifying SSRS
   g. Procuring probate court order without physician certification

h. Patient Advocate Lewis fabricating "protocol" justification
i. Making false statements to state court
j. Concealing contradictory evidence
k. Ongoing cyber attacks and defamation

281. Conspiracy was motivated by class-based animus: citizens who threaten litigation against governmental officials.

282. Plaintiff was injured in person and property by conspiracy.

283. All Defendants are jointly and severally liable.

==========================================
COUNT VII
18 U.S.C. § 1986 - NEGLECT TO PREVENT CONSPIRACY
(Against Defendants with Knowledge Who Failed to Prevent)
==========================================

284. Plaintiff incorporates by reference all preceding paragraphs.

285. Certain Defendants had knowledge of conspiracy to violate civil rights and had power to prevent it, but neglected or refused to do so.

286. Specifically:
   a. PLBH employees knew commitment improper (refused admission) but failed to report conspiracy
   b. Law enforcement knew Safety Concerns: NONE but participated in unlawful transport
   c. MUSC evaluators knew no diagnosis existed but failed to release Plaintiff
   d. Patient Advocate Lewis knew of fabrications but engaged in cover-up rather than reporting
   e. Supervisors at each entity knew or should have known of pattern of violations

287. These Defendants are liable under 18 U.S.C. § 1986 for neglecting to prevent conspiracy.

==========================================
QUALIFIED IMMUNITY DOES NOT PROTECT INDIVIDUAL DEFENDANTS
==========================================

288. Individual Defendants PFEIL, MCGARTY, GUERRIERO, JOHN DOE PROBATE JUDGE, JOHN DOE MUSC EVALUATORS, JOHN DOE MUSC CHARGE NURSE, and LEWIS cannot claim qualified immunity because they violated clearly established constitutional rights.

289. Under Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), qualified immunity protects government officials from liability unless they violated "clearly established statutory or constitutional rights of which a reasonable person would have known."

290. The rights violated here were clearly established at the time of the May 1, 2025 incident:

FIRST AMENDMENT RETALIATION (CLEARLY ESTABLISHED SINCE 2006)

291. Under Hartman v. Moore, 547 U.S. 250 (2006), the First Amendment prohibits governmental retaliation for exercising the right to petition courts for redress of grievances, including threatening litigation.

292. It has been clearly established for decades that government officials cannot retaliate against citizens for threatening to sue.

293. No reasonable official could believe that fabricating evidence ("sue" changed to "hurt") to manufacture a violent threat from a statement of legal intent was constitutional.

294. No reasonable official could believe that coordinating a 15-minute phone call with a supervisor immediately after a citizen threatens litigation, then detaining that citizen, was anything other than retaliation.

FOURTH AMENDMENT SEIZURE BASED ON FABRICATED EVIDENCE (CLEARLY ESTABLISHED)

295. Under the Fourth Amendment, it has been clearly established that government officials cannot seize a person based on fabricated evidence. Whiteley v. Warden, 401 U.S. 560 (1971).

296. No reasonable official could believe that detaining someone after documenting "Safety Concerns: NONE" and "Emergency: N" was constitutional.

297. No reasonable official could believe that parking at maximum distance from a person they claim is dangerous, then using that position as "evidence" of danger, was lawful.

298. The physical positioning (maximum distance parking) and timing (15+ minutes unsupervised) make it objectively unreasonable for any official to claim they believed Plaintiff was dangerous.

FOURTEENTH AMENDMENT DUE PROCESS (CLEARLY ESTABLISHED SINCE 1979)

299. Under Addington v. Texas, 441 U.S. 418 (1979), civil commitment requires due process protections including proof by clear and convincing evidence.

300. It has been clearly established that involuntary psychiatric detention requires: (1) examination by a qualified professional, (2) specific psychiatric diagnosis, (3) court order based on proper certification.

301. No reasonable official could believe that proceeding with commitment after admitting "He needs someone with more degrees than us" satisfied due process.

302. No reasonable official could believe that accepting a commitment after a psychiatric hospital refused for "lack of medical clearance" was constitutional.

FABRICATION DEFEATS QUALIFIED IMMUNITY

303. The systematic fabrication itself defeats qualified immunity. Officers who knowingly violate the Constitution by fabricating evidence are not entitled to qualified immunity. Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997).

304. The deliberate nature of the violations is demonstrated by:
   a. Pattern of over ten specific fabrications;
   b. Physical evidence proving consciousness of falsity (parking at maximum distance);
   c. Temporal evidence proving consciousness (15+ minutes unsupervised);
   d. Documentary evidence proving consciousness (own records state "Safety Concerns: NONE");
   e. Admission evidence proving consciousness ("He needs someone with more degrees than us").

305. When officials act with knowledge that their conduct violates constitutional rights, qualified immunity does not apply. Malley v. Briggs, 475 U.S. 335, 341 (1986).

306. Therefore, qualified immunity does not protect any individual Defendant from liability for the constitutional violations alleged herein.


=========================================
COUNT VIII
42 U.S.C. § 1983 - HIV/STD TESTING WITHOUT INFORMED CONSENT VIOLATION OF FOURTH AMENDMENT RIGHT TO BODILY INTEGRITY (Against MUSC Defendants and BHDD Defendants Who Ordered Testing)
=========================================

307. Plaintiff incorporates by reference all preceding paragraphs.

308. As detailed in Plaintiff's State Court Complaint (Exhibit T) filed June 24th, 2025 at ¶[3], Defendants subjected Plaintiff to HIV and Hepatitis C testing without informed consent, in violation of federal testing guidelines and South Carolina law.

309. Federal guidelines issued by the Centers for Disease Control and Prevention (CDC) require pre-test counseling and informed consent for HIV testing.

310. South Carolina law requires informed consent for HIV testing. S.C. Code Ann. § 44-29-135.

311. Despite these clear legal requirements, Defendants:
   A. Subjected Plaintiff to HIV and Hepatitis C testing without pre-test counseling;
   B. Did not obtain written informed consent;
   C. Did not provide Plaintiff any option to refuse testing;
   D. Told Plaintiff the testing was "routine screening" for infections;
   E. Justified testing by stating it was "for your safety and to protect other people in the ward."

312. Defendants' own medical records ADMIT this systematic violation, stating:
"We do routine screening for infections like HIV and hepatitis C." The admission of "routine screening" without informed consent establishes PATTERN AND PRACTICE liability under Monell v. Dep't of Social Services, 436 U.S. 658 (1978), making institutional defendants liable for systematic constitutional violations. This admission proves:
   a. Testing was NOT based on medical necessity (no individual assessment);
   b. Testing was "routine" policy regardless of medical indication;
   c. Informed consent was systematically bypassed as institutional practice;
   d. This was not an isolated incident but a pattern affecting all patients.

313. The statement "to protect other people in the ward" reveals discriminatory assumptions about Plaintiff based on the fabricated psychiatric emergency and demonstrates that testing was not medically indicated but rather based on unfounded suspicions.

314. No medical necessity for HIV/STD testing was documented in Plaintiff's medical records. The HIV/STD testing served dual unlawful purposes:
   A. MEDICAL RECORD PADDING: Creating pages of medical documentation unrelated to psychiatric assessment to conceal the fact that no qualified mental health professional diagnosed Plaintiff or certified need for commitment;
   B. PRETEXTUAL JUSTIFICATION: Providing appearance of "comprehensive medical evaluation" while systematically avoiding the psychiatric assessment required by South Carolina law for involuntary commitment.

315. The medical records provided to Plaintiff contain extensive HIV/STD testing procedures but show Negative results, psychiatric diagnosis field BLANK, and psychiatric evaluation UNSIGNED, proving the testing was used to pad records while avoiding required psychiatric assessment.

316. This involuntary medical testing violates the Fourth Amendment right to bodily integrity and the Fourteenth Amendment right to informed consent for medical procedures.

317. Under Winston v. Lee, 470 U.S. 753 (1985), the Fourth Amendment protects individuals' "interest in the integrity of their bodies" and prohibits governmental intrusions absent compelling justification and proper procedures.

318. Under Washington v. Harper, 494 U.S. 210 (1990), individuals have a significant liberty interest in avoiding unwanted medical treatment, protected by the Due Process Clause.

319. No reasonable official could believe that ordering HIV/STD testing without informed consent, under pretext of fabricated psychiatric emergency, was constitutional.

320. The testing was particularly egregious because:
    a. Conducted during unlawful detention based on fabricated evidence;
    b. Used to pad medical records and conceal absence of psychiatric assessment;
    c. Justified with discriminatory rationale ("protect other people");
    d. No medical indication documented;
    e. Federal and state law clearly require informed consent.

321. This violation of bodily integrity, combined with the discriminatory justification provided, constitutes an independent basis for liability under 42 U.S.C. § 1983.

322. Plaintiff is entitled to compensatory damages for this violation of bodily autonomy and punitive damages for the deliberate disregard of clearly established rights to informed consent.

=========================================
STATE LAW CLAIMS
=========================================

COUNT VIX
FALSE IMPRISONMENT
(State Law - Against All Individual Defendants)
=========================================

323. Plaintiff incorporates by reference all preceding paragraphs.

324. Defendants intentionally confined Plaintiff for approximately 18 hours.

325. Plaintiff did not consent to confinement.

326. Defendants had no lawful authority to confine Plaintiff:
    a. No medical basis (Safety Concerns: NONE, Emergency: N, PLBH refusal)
    b. No qualified professional certification
    c. No valid commitment order (procured by fraud)
    d. South Carolina legal requirements not met

327. Probate court order does not immunize Defendants because order was procured by fraud.

328. Under South Carolina law, fraud vitiates everything it touches, including court orders.

329. Order procured through deliberate fabrication, forum-shopping after proper refusal, and coordination before requirements met is void ab initio.

330. Defendants are liable for false imprisonment.

=========================================
COUNT X
NEGLIGENCE
(State Law - Against All Defendants)
=========================================

331. Plaintiff incorporates by reference all preceding paragraphs.

332. Defendants owed duty of care to Plaintiff.

333. Defendants breached duty of care by:
   a. Failing to conduct proper assessment
   b. Fabricating assessment records
   c. Failing to ensure qualified professional evaluation
   d. Forum-shopping after proper psychiatric refusal
   e. Bypassing legal safeguards
   f. Detaining without medical basis

334. Breach of duty caused Plaintiff's injuries.

335. Defendants are liable for negligence.

=========================================
COUNT XI
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(State Law - Against All Individual Defendants)
=========================================

336. Plaintiff incorporates by reference all preceding paragraphs.

337. Defendants' conduct was intentional or reckless.

338. Defendants' conduct was extreme and outrageous:
   a. Fabricating over ten false statements
   b. Falsifying standardized instruments
   c. Weaponizing psychiatric system for retaliation
   d. Forum-shopping after psychiatric experts refused
   e. Multi-entity conspiracy

44

f. Ongoing cyber attacks and defamation
g. 20-hour detention without medical basis
h. Converting theft report into delusion claim

339. Conduct caused severe emotional distress.

340. Emotional distress was a foreseeable result of Defendants' conduct.

341. Defendants are liable for intentional infliction of emotional distress.


========================================
COUNT XII
MALICIOUS PROSECUTION
(State Law - Against All Individual Defendants)
========================================

342. Plaintiff incorporates by reference all preceding paragraphs.

343. Defendants initiated involuntary commitment proceeding.

344. Proceeding lacked probable cause:
   a. Safety Concerns: NONE
   b. Emergency: N
   c. PLBH refused for lack of medical clearance
   d. No qualified professional certification

345. Defendants acted with malice:
   a. Retaliation for litigation threat
   b. Fabrication of records
   c. Falsification of standardized instruments
   d. Forum-shopping after proper refusal
   e. Physical evidence proving consciousness of fabrication

346. Proceeding terminated in Plaintiff's favor: diagnosis BLANK, unsigned, no commitment.

347. Plaintiff suffered damages.

348. Defendants are liable for malicious prosecution.


========================================
COUNT XIII
ABUSE OF PROCESS
(State Law - Against All Individual Defendants)

========================================

349. Plaintiff incorporates by reference all preceding paragraphs.

350. Defendants used the involuntary commitment process.

351. Defendants used the process for ulterior purposes: retaliation for threatening litigation, not medical necessity.

352. Improper use proven by:
    a. Timeline (litigation threat → coordination → detention)
    b. Their own findings contradicting emergency
    c. PLBH refusal proving no medical basis
    d. Physical evidence proving consciousness of fabrication
    e. Systematic fabrication to manufacture justification

353. Plaintiff was harmed by improper use of process.

354. Defendants are liable for abuse of process.

========================================
NOTICE REGARDING EXHIBITS
========================================

355. Plaintiff attaches the following exhibits to this Complaint, submitted simultaneously herewith and incorporated by reference:
Exhibit A: Crisis Intervention Sheet (May 1, 2025) - Bates NDUNDA-01
Exhibit B: Service Log (May 1, 2025) - Bates NDUNDA-02 to NDUNDA-04
Exhibit C: MUSC Evaluation Form (May 2, 2025) - Bates NDUNDA-05
Exhibit D: Patient Advocate Response (June 3, 2025) - Bates NDUNDA-06
Exhibit E: Mother's Affidavit - Bates NDUNDA-07
Exhibit F: Father's Affidavit - Bates NDUNDA-08
Exhibit G: Router Logs (494 Devices) Bates: NDUNDA-09
Exhibit H: AT&T Subpoena Documentation Bates: NDUNDA-010 to NDUNDA-014
Exhibit I: FBI FOIPA Response Bates: NDUNDA-015
Exhibit J: Law Enforcement FOIA Response (Clean Record) Bates: NDUNDA-016 to NDUNDA-017
Exhibit K: Defendants' Memorandum in Support of Motion to Dismiss (State Court) Bates: NDUNDA-018 to NDUNDA-022
Exhibit L: Defendants' Motion to Dismiss Bates: NDUNDA-023
Exhibit M: Timeline Chart - Retaliation Sequence Bates: NDUNDA-024 to NDUNDA-029
Exhibit N: Parking Position Diagram Bates: NDUNDA-030
Exhibit O: Photograph of Parking Location Bates: NDUNDA-031
Exhibit P: Redacted Mobile Crisis Assessment Bates: NDUNDA-032 to NDUNDA-035

Exhibit Q: Email Correspondence with Patient Advocate Tia Lewis Bates: NDUNDA-036 to NDUNDA-37

Exhibit R: Plaintiff's IC3 (Internet Crime Complaint Center) Submissions Bates: NDUNDA-038 to NDUNDA-039

Exhibit S: Audio Recording of Defense Counsel Statement Bates: NDUNDA-040

Exhibit T: HIV/STD Testing Without Informed Consent: Bates: NDUNDA-041 to NDUNDA-043

340. These exhibits are submitted as proof of the factual allegations in this Complaint and demonstrate Defendants' consciousness of fabrication through their own contemporaneous documentation.

==========================================

PRAYER FOR RELIEF

==========================================

WHEREFORE, Plaintiff respectfully requests this Court:

A. ASSUME JURISDICTION over this matter;

B. DECLARE that Defendants violated Plaintiff's constitutional rights under the Fourth Amendment, First Amendment, and Fourteenth Amendment;

C. DECLARE that Defendants conspired to violate Plaintiff's civil rights under 18 U.S.C. §§ 1985 and 1986;

D. DECLARE that governmental entity Defendants are liable under Monell for policies, customs, and practices causing constitutional violations;

E. AWARD COMPENSATORY DAMAGES in amount to be proven at trial, including:
   - Economic damages for lost wages, medical expenses, and costs of litigation
   - Non-economic damages for physical and emotional suffering, loss of liberty, humiliation, and reputational harm
   - Damages for ongoing cyber attacks and defamation preventing legal representation;

F. AWARD PUNITIVE DAMAGES against individual Defendants to punish conscience-shocking conduct and deter future violations;

G. AWARD NOMINAL DAMAGES for each constitutional violation;

H. ISSUE PRELIMINARY AND PERMANENT INJUNCTIONS:
   - Ordering immediate investigation of ongoing cyber attacks
   - Requiring preservation of all evidence
   - Prohibiting further retaliation against Plaintiff
   - Requiring policy changes to prevent future violations

- Appointing special master or technical expert to investigate cyber attacks and electronic interference;

I. ORDER DEFENDANTS TO PRODUCE all concealed evidence including:
  - Complete unredacted crisis assessment
  - All probate court communications (timing, content, which judge)
  - Phone records from 15-minute coordination call
  - Parking documentation and positioning protocols
  - Body camera footage from law enforcement or explanation of absence
  - Patient Advocate investigation file (complete, unredacted)
  - PLBH refusal documentation (complete records)
  - MUSC admission coordination records
  - All standardized instruments (SSRS, etc.)
  - Quality Improvement investigation records;

J. AWARD ATTORNEY'S FEES AND COSTS under 42 U.S.C. § 1988 if Plaintiff obtains counsel;

K. AWARD PRE-JUDGMENT AND POST-JUDGMENT INTEREST;

L. GRANT LEAVE TO AMEND to add additional defendants as their identities are discovered through discovery;

M. ORDER SUCH OTHER AND FURTHER RELIEF as this Court deems just and proper.

N. IMMEDIATE INJUNCTIVE RELIEF:
- Temporary Restraining Order (TRO) prohibiting further retaliation
- Order directing Defendants to cease surveillance and harassment
- Protective order preventing destruction of evidence
- Expedited discovery on ongoing cyber intrusions

=========================================
DEMAND FOR JURY TRIAL
=========================================

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted this 28th day of October, 2025.

_____

JOEL NDUNDA
4015 Laurelwood Dr
8438224869
geospatial02@outlook.com
Pro Se Plaintiff

**I declare under penalty of perjury that the foregoing is true and correct.**

*Signed this* __29 TH__ *day of* __October__ , 20 __25__ .

_____

*Signature of Party Responding*